UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

RICHARD JOHNSON and DEANNA )
JOHNSON, )
)
Plaintiffs, )
)          Cause No. 2:20-CV-165-PPS-JPK
v. )
)
CENTROME, INC., *et al.*, )
)
Defendants. )
)

## OPINION AND ORDER

This case presents challenging questions under the Indiana Product Liability Act ("IPLA"), specifically its applicability in the context of toxic torts. From 1992 to 1999, Richard Johnson worked for ConAgra Brands, Inc. at the Orville Redenbacher Popcorn Factory in Valparaiso. In the course of his employment, Mr. Johnson was allegedly exposed to toxic flavoring chemicals containing diacetyl, 2,3-hexanedione, and 2,3-heptanedione, causing him to develop a respiratory illness. Through this action, Mr. Johnson (and his wife) seek to recover damages for his injuries from various companies alleged to have manufactured, supplied, distributed, and sold toxic flavorings used at the Valparaiso facility.

The sole named defendant remaining in the case, Givaudan Flavors Corporation, filed a motion for summary judgment [DE 169; DE 170; DE 182], arguing that Plaintiffs' product liability claims are time-barred under the IPLA statute of repose, Ind. Code § 34-20-3-1(b). Because there is no dispute that the Johnson's product liability claims were

brought years after the deadline prescribed by the applicable statute of repose, summary judgment must be entered for Givaudan.

## Procedural Background

I previously detailed the relevant background on the parties and Johnson's operative complaint [*see* DE 137], but for convenience sake I'll provide a brief summary of the case to date. The initial complaint asserted sprawling tort claims against fifteen defendants. Then, in the amended complaint, Johnson dropped some defendants and then later voluntarily dismissed several others. [DE 29; DE 34; DE 48; DE 74; DE 134; DE 154; DE 161; DE 164; DE 226.] The remaining defendants filed or joined motions to dismiss on various grounds [DE 61; DE 77], and I granted those motions in part [DE 137]. In summary, I determined that Plaintiffs' fraudulent concealment and negligence claims were subsumed by their IPLA claims and thus merged those claims into causes of action for manufacturing defect, design defect, and failure to warn. [DE 137 at 4–5.] In doing so, I concluded that Johnson's allegations relating to products containing "diacetyl, 2,3-hexanedione, and 2,3-heptanedione" alleged plausible IPLA claims. *Id.* at 5–9.

What is left in the case are claims against Givaudan, one of the companies alleged to have sold butter flavors containing diacetyl to ConAgra used in the production of microwave popcorn during the time period Johnson worked at its Valparaiso facility. Johnson's claims sound in product liability (Counts 1–5), as well as a derivative claim for his wife's loss of consortium (Count 6). He asserts that Givaudan "imported, extracted, formulated, manufactured, supplied, distributed, and sold diacetyl, including the

diacetyl that caused . . . injuries to his respiratory system and related illnesses and injuries[.]" [DE 34, ¶ 13.] As I acknowledged in my prior order, Johnson previously conceded that his fraudulent concealment and negligence claims were subsumed by the IPLA. [DE 83 at 2 n.1; DE 137 at 5.] While at that time, Johnson "reserve[d] the right to assert fraudulent concealment in the event any defendant asserts this action is time barred," *id.*, he has not sought leave to amend the operative complaint.

The parties briefed Givaudan's motion for summary judgment and I held a hearing on the motion. [DE 169; DE 170; DE 180; DE 182; DE 204.] The heart of the dispute is whether Johnson's claims fall under a judicially-created exception to the IPLA statute of repose. *See generally Covalt v. Carey Canada, Inc.*, 543 N.E. 2d 382 (Ind. 1989). Following the hearing, the parties were instructed to submit supplemental briefs more squarely addressing this issue and properly setting forth any facts material to application of the statute of repose that are in genuine dispute. [DE 205.] The motion for summary judgment then pending was vacated; and Givaudan was granted leave to reinstate the motion following the supplemental briefing. *Id.* The parties subsequently filed supplemental briefs and statements of material facts in dispute teeing up the relevant issues [*see* DE 210; DE 211; DE 215; DE 216; DE 218; DE 219], and Givaudan later moved to reinstate its motion for summary judgment [DE 248]. As indicated at the hearing, the motion for summary judgment [DE 169] will be reinstated and I now take the matter up with the benefit of the parties' supplemental briefing.

**Undisputed Facts**

Richard Johnson worked at ConAgra's microwave popcorn plant in Valparaiso from 1992 until 1999. He was a utility worker and machine operator from 1992 to 1996, then a batch deck compounder from 1996 to 1998. [DE 215 at 2; DE 211 at 9–10.] As a batch deck compounder, he worked on the "batch deck," a location indoors on the production floor where workers would stir up batches of the salt, oil, and flavoring mixture that would eventually go into bags of Orville Redenbacher microwave popcorn. After the summer of 1998, Johnson worked in "raw materials," a position in which he was outside "99.9 percent of the time," entered the facility roughly "[o]nce a day," and was not directly handling any of the flavoring products at issue. [DE 215-2 at 41.] While he worked in the raw materials department, he began experiencing shortness of breath accompanied by a cough and wheezing. [DE 211-1 at 9–10, 14–15.]

Givaudan sold butter flavorings to ConAgra's Valparaiso plant while Johnson worked there. Based on the company's review of available sales data, its only sales of flavors to ConAgra's Valparaiso plant "occurred in 1994 and January 1995." [DE 170-1, ¶¶ 2–4.] So, the last point in time Johnson could have come in contact with toxic chemicals that Givaudan allegedly supplied to the ConAgra plant would be January 1995 – twenty-five years prior to the filing of this action. Johnson does not dispute this point.

Johnson testified at his deposition that near the end of his employment at ConAgra in August 1998, he was experiencing "shortness of breath." At the time, he

continued to experience shortness of breath with coughing and wheezing any time he had any type of physical exertion; and the shortness of breath would typically last four to five minutes. As explained below, for the next decade, he routinely sought and obtained treatment for chronic respiratory illness – ultimately culminating in an open lung biopsy and diagnosis of "chronic bronchiolitis with bronchiectasis and mucostasis" by physicians at the Mayo Clinic in early 2009.

Several times in 1998, Johnson went to his primary care doctor, Dr. Kenneth Black, to seek treatment for his lung problems. [*See* DE 211-1 at 15–18, 33–35.] Johnson told his doctor that he has "trouble breathing. I work around corn." *Id*. at 33. Notes from these visits suggest that Johnson was struggling quite a bit with shortness of breath – it was "[a]ffecting [his] life-style," occurred at work and at home, Johnson was unable to "exert as much at home," and "medication does not appear to be helping." *Id.* at 35.

In 1999, Dr. Black referred him to a new pulmonologist, Dr. Mazurek. *Id.* at 18; *see id.* at 35 (handwritten note reflecting referral March 18, 1999). Dr. Mazurek proceeded to treat Johnson once every four months for the next few years. *Id.* at 18. After treating with Dr. Mazurek for several years, Johnson started treating with another pulmonologist, Dr. Ahmed. *Id.* Johnson recalled treating with Dr. Ahmed approximately twice a year for a period of three to five years. *Id.* Neither Dr. Mazurek nor Dr. Ahmed ordered Johnson to undergo a pulmonary function test. However, Johnson testified that he continued to have shortness of breath throughout this period and the physicians treated him with

5

medications designed to block the action of inflammatory chemicals in the body that cause lung inflammation, as well as rescue inhalers. *Id.*

In 2008, Johnson went to a third pulmonologist, Dr. Wu, who continued treating his chronic respiratory illness. Johnson was prescribed prednisone tablets. Additionally, he recalled that Dr. Wu ordered a chest X-ray, CT scan, and bronchoscopy. [DE 211-1 at 19.] Johnson further testified that the bronchoscopy did not provide sufficient information for Dr. Wu to provide a diagnosis of his respiratory illness, so Dr. Wu ordered an open lung biopsy to follow up. *Id.* In November 2008, Johnson also recalled undergoing a pulmonary function test. *Id.* at 21. At the time of the test, Johnson had been experiencing shortness of breath, which he was treating with a rescue inhaler; but he did not report any other symptoms. *Id.*

In January 2009, Johnson underwent a surgical lung biopsy at La Porte Hospital. *Id.* at 38–41. The lab results were reviewed by Dr. Anja Roden and Dr. Eunhee Yi at the Mayo Clinic, who provided a "final pathologic diagnosis" of "chronic bronchiolitis with bronchiectasis and mucostasis." *Id.* at 41. Features of Johnson's lungs were characterized as "more consistent with small airway disease with bronchiolar metaplasia," than with usual interstitial pneumonia ("UIP" - a form of lung disease characterized by progressive scarring of both lungs). *Id.*

Johnson later conceded in discovery filings that, at this point in January 2009, he was diagnosed with "chronic bronchiolitis with bronchiectasis and mucostasis" and "interstitial lung disease." [DE 166 at 3 (citing DE 166-1 (Plattenberger Decl.), ¶¶ 5–6).] In

the same filing, Johnson represented to the Court that "[d]octors at the Mayo Clinic confirmed the diagnosis," and he "was told that he had contracted biopsy confirmed bronchiolitis—known today colloquially as 'popcorn lung' because of its relationship to popcorn butter flavoring containing diacetyl—a rare, severe, and permanent narrowing of the bronchial tubes in the lungs." *Id.*

This is an important admission, as discussed in greater detail below, because Plaintiffs claim that exposure to diacetyl can cause a variety of respiratory problems, including chronic cough, shortness of breath, and "other respiratory illness and disease," and that as a result of exposure to diacetyl, Mr. Johnson "sustained injuries to his respiratory system and related illnesses and injuries." [DE 34, ¶ 41; *see id.*, ¶¶ 13, 23, 84.] In other words (and his own words in filings submitted to the Court), as of January 2009, Johnson had been diagnosed with "biopsy confirmed bronchiolitis," also known as "popcorn lung" – the exact type of respiratory injury for which he seeks redress.

## Discussion

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A motion for summary judgment has been described as the time in a lawsuit to "put up or shut up." *Grant v. Trustees of Indiana University*, 870 F.3d 562, 568 (7th Cir. 2017). If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but

mandated. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of *some* alleged factual dispute between the parties," *id.* at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). And not every factual dispute between the parties makes summary judgment inappropriate. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

Defendants assert that all of Mr. Johnson's remaining claims (Counts 1–5) are governed by the IPLA statute of repose. The sole exception is Mrs. Johnson's derivative claim for loss of consortium (Count 6). But while this derivative claim is not subject to the IPLA statute of repose, it rises and falls with the IPLA claims. *See Palmer v. Gorecki*, 844 N.E.2d 149, 156–57 (Ind. Ct. App. 2006) (holding that derivative "consortium claim is not viable," in light of summary judgment on spouse's underlying claims under statute

of limitations); *Bender v. Peay*, 433 N.E.2d 788, 792 (Ind. Ct. App. 1982) ("[A] loss of consortium claim cannot be brought when the injured spouse's claim has been adjudicated and lost."). Therefore, my focus will remain on Mr. Johnson's tort claims.

## I.    The IPLA Statute of Repose

In this diversity case, I apply Indiana's substantive law to determine whether Plaintiffs' tort claims are untimely. *Tolen v. A.H. Robins Co.*, 570 F. Supp. 1146, 1149 (N.D. Ind. 1983) (citing *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938); *Goldberg v. Medtronic*, 686 F.2d 1219 (7th Cir. 1982)). A statute of repose places "an outer limit on the right to bring a civil action," measured "not from the date on which the claim accrues but instead from the date of the last culpable act or omission of the defendant." *CTS Corp. v. Waldburger*, 573 U.S. 1, 8 (2014).

The IPLA statute of repose can be found at Indiana Code § 34-20-3-1(b), and it's an affirmative defense. *Jurich v. John Crane, Inc.*, 824 N.E.2d 777, 780 (Ind. Ct. App. 2005) (citing *Boggs v. Tri-State Radiology, Inc.*, 730 N.E.2d 692, 695 (Ind. 2000)). Here's what the statute says:

> [A] product liability action must be commenced:
>
> (1) within two (2) years after the cause of action accrues; or
>
> (2) within ten (10) years after the delivery of the product to the initial user or consumer.
>
> However, if the cause of action accrues at least eight (8) years but less than ten (10) years after that initial delivery, the action may be commenced at any time within two (2) years after the cause of action accrues.

The Supreme Court of Indiana has interpreted subsections (1) and (2) conjunctively, noting that the "clear intention of the legislature . . . was to limit the time within which product liability actions can be brought." *Estabrook v. Mazak Corp.*, 140 N.E.3d 830, 836 (Ind. 2020) (citation omitted); *Braswell v. Flintkote Mines, Ltd.*, 723 F.2d 527, 529 (7th Cir. 1983) (noting the statute provides "a two-year statute of limitations, limited by a ten-years-from-delivery clause"). In other words, an action subject to the IPLA statute of repose must be brought "within two years after it accrues, but in any event within ten years after the product is first delivered to the initial user or consumer, unless the action accrues more than eight but less than ten years after the product's introduction into the stream of commerce." *Dague v. Piper Aircraft Corp.*, 418 N.E.2d 207, 210 (Ind. 1981). As the Supreme Court of Indiana recently reiterated, there is a limited statutory exception to this rule: if a cause of action accrues at least eight, but less than ten years after initial delivery of the product, the cause of action may be commenced at any time within two years after it accrues. *Estabrook*, 140 N.E.3d at 831–32. The only other exception is a judicially-created one dealing with allegations of latent harm from exposure to asbestos. *Myers v. Crouse-Hinds Div. Of Cooper Industries, Inc.* 53 N.E. 3d 1160 (Ind. 2016). (More on that later.)

In *Estabrook*, the plaintiff was harmed while working on a defective machine owned by his employer. He filed a product-liability suit that would have been barred by the express terms of the IPLA statute of repose. The question presented was whether the court should apply "a judicially created exception to the statute of repose" to extend

10

the ten-year time limit based on "post-sale repair [or] refurbishment [or] reconstruction of the product," and if so, how to determine when the supplier of a product "has done sufficient work to trigger the extension[.]" 140 N.E.3d at 832–33. Applying the plain language of the statute, the Court held that unless the statutory exception applies, the "ten-year limitations period cannot be extended for any other reason – including a manufacturer's post-sale repair, refurbishment, or reconstruction of a product." *Id.* While the parties presented good arguments for either approach, the Supreme Court determined that narrow construction of the period of repose was necessary to give effect to the "legislature's policy choices" and "stated preferences." *See id.* at 834–36.

As a threshold issue, the parties dispute who carries the burden of demonstrating Plaintiffs' claims are barred under the statute of repose. They appear to agree that where the burden falls is a matter of substantive law, and thus Indiana law controls the issue. Givaudan directs my attention to *Avery v. Mapco Gas Products*. In *Avery*, the Seventh Circuit concluded that the party asserting that a claim is barred by the IPLA statute of repose bears an "initial burden" to present evidence "tending to show" that the claims are untimely under its plain terms. 18 F.3d 448, 452 (7th Cir. 1994) (citing *Hefti v. Internal Revenue Service*, 8 F.3d 1169, 1171 (7th Cir. 1993)). Applying state law, the court further held that once the movant makes this showing, the party opposing application of the statute of repose must "come forward with evidence sufficient to establish a establish a genuine factual dispute." *Id.* (citing *Nichols v. Amax Coal Co.*, 490 N.E.2d 754, 755 (Ind. 1986)). Under Indiana law, the party opposing

summary judgment "would bear the burden . . . of establishing avoidance of the statute of repose," meaning an opponent's "failure to offer proof sufficient to support a jury finding in their favor on this point would compel summary judgment" in favor of the movant. *Id.*

Plaintiffs argue that *Avery* came down prior to a 1998 amendment to the IPLA. The amendment, in pertinent part, provides that the burden of proof in any defense in an action under the IPLA is on the party raising the defense. Ind. Code § 34-20-6-2. From my review of the case law, the amendment does not appear to have changed the burden-shifting framework acknowledged in *Avery. See Blackford v. Welborn Clinic*, 172 N.E.3d 1219, 1223 (Ind. 2021); *Jurich*, 824 N.E.2d at 780 (where defendants "undisputedly established" suit was brought after statute of repose expired, the "burden was on the [plaintiffs] to demonstrate a material issue of fact that would avoid application of the statute of repose").

Following the Seventh Circuit's approach in *Avery*, and the approaches of a handful of district courts that have encountered similar issues since the 1998 amendment to the IPLA, I find that Givaudan bears the initial burden of establishing the action was commenced beyond the statutory period; then, the burden shifts to Plaintiffs to establish a genuine dispute of material fact as to whether their claims avoid the statute of repose. *See* 18 F.3d at 452; *C.A. v. AMLI at Riverbend, L.P.*, 2008 WL 140801, at *5 (S.D. Ind. Jan. 10, 2008); *Miller v. Honeywell Int'l Inc.*, 2001 WL 395149, at *6 (S.D. Ind. Mar. 7, 2001).

## II.     Plaintiffs' Claims Were Undisputedly Filed After the Expiration of the Ten-Year Statute of Repose

Evaluating the evidence in light of the parties' respective burdens, I find there is no material dispute that this lawsuit was filed more than ten years after the last point when Mr. Johnson could have come in contact with toxic flavoring chemicals supplied by Givaudan that could have been used at the Valparaiso facility.

This case was filed in April 2020. Johnson's employment at ConAgra ended more than two decades earlier, establishing a temporal bound on when he could have come in contact with Givaudan's flavorings. Johnson testified that he worked as a "batch deck compounder" starting in 1996. This was the only role in which he interacted directly with flavoring chemicals. Givaudan's last supply of flavorings to the ConAgra plant while Johnson worked there occurred in January 1995.

Applying the plain terms of the IPLA statute of repose, Mr. Johnson's claims (and therefore his wife's) fail as a matter of law. If he was exposed to any toxic flavorings supplied by Givaudan, Johnson would have last been exposed in 1995 – meaning that he had until 2005 to file his claims. Even assuming that Johnson was exposed on his final day of work in 1999 (and there is no evidence supporting such a conclusion), his claims would still be hopelessly stale. And under the limited statutory exception addressed in *Dague* and *Estabrook*, Johnson's claims are similarly barred based on his last possible exposure to a flavoring product supplied by Givaudan. If Johnson was last exposed to Givaudan's toxic chemicals in 1995, and his claims accrued between

13

eight to ten years down the line (2003 or 2004), then he was required to file his claims in the next two years (by 2006). He was fourteen years late.

Having concluded that Givaudan has undisputedly established that this action was brought after IPLA statute of repose expired, I will now consider whether Plaintiffs have demonstrated any genuine dispute of material fact that would avoid application of the statute of repose.

### III.    Johnson's Tort Claims are Governed by the IPLA

Evaluating whether Plaintiffs have set forth evidence sufficient to establish a triable dispute that avoids application of the statute of repose raises a seemingly obvious question: is Mr. Johnson really asserting a product liability claim, as opposed to an independent tort like negligence? The parties did not address this issue head-on in their briefs. But it strikes me that Mr. Johnson (a worker exposed to flavoring chemicals used to create a buttery mixture later incorporated into microwave popcorn) is not the typical product liability plaintiff. When one thinks about strict liability for defective products, the mind conjures up images of a poor fellow injured by a bum blade on a lawnmower, or a weed wacker with an inadequate warning label – not a worker at an industrial plant mixing chemicals into a "slurry" mixture, several steps removed from a finished product.

I previously ruled that the IPLA subsumed Plaintiffs' separate tort claims sounding in negligence in fraudulent misrepresentation. [DE 137 at 4–5.] While I do not believe it is necessary to revisit that ruling, and the parties appear to agree that the

IPLA applies, whether Plaintiffs' claims sound in products liability now appears to be a case-dispositive issue. I will therefore pause to consider antecedent questions bearing on whether Johnson's claims are in fact governed by the IPLA. Because my review of the relevant state law persuades me that Plaintiffs' claims are, indeed, covered by the plain terms of the IPLA, I do not need to evaluate whether the claims are timely under limitations periods applicable to independent torts not sounding in product liability.

As construed by the Supreme Court of Indiana, the IPLA governs "all actions" brought by a "user or consumer" of a product against a manufacturer or seller "for physical harm caused by the product," regardless of the "substantive legal theory or theories upon which the action is brought." *Campbell v. Supervalu, Inc.*, 565 F. Supp. 2d 969, 976 (N.D. Ind. 2008) (citing *Dague*, 418 N.E.2d at 212); *see* Ind. Code § 34-20-1-1 (providing that IPLA governs all actions brought by a user or consumer against a manufacturer or seller for physical harm caused by a product).

The law is clear that personal injury claims stemming from alleged defects in a defendant's product fall under the scope of the IPLA. *See, e.g., Stegemoller v. AcandS, Inc.*, 767 N.E.2d 974, 975–76 (Ind. 2002) (construing *Dague*, 418 N.E.2d at 212) (holding that IPLA covered claims asserted by worker's spouse, who contracted asbestos-related illness after husband brought asbestos fibers home on his clothing); *Butler v. City of Peru*, 733 N.E.2d 912, 919 (Ind. 2000) (holding that claims by maintenance employee of high school harmed while attempting to fix defective electrical outlet on property were covered by IPLA). Here, Johnson seeks redress for personal injuries suffered as a result

of exposure to toxins in defective flavoring chemicals, so this "action" is one "for physical harm caused by the product." *See Campbell*, 565 F. Supp. 2d at 976.

But whether Johnson qualifies as a "user or consumer" of a defective product presents a more difficult question. *See* Ind. Code § 34-20-1-1. The determination who qualifies as a "user or consumer" under the statutory definitions "is a legal question, to be decided by the court." *Stegemoller*, 767 N.E.2d at 975 (citing *Estate of Shebel v. Yaskawa Elec. Am., Inc.*, 713 N.E.2d 275, 279 (Ind. 1999)). A "user" is defined as a consumer; and a "consumer" could be a few species of individuals: (1) "a purchaser"; (2) "*any individual who uses or consumes the product*"; (3) "any other person who, while acting for or on behalf of the injured party, was in possession and control of the product in question"; or (4) "*any bystander* injured by the product who would reasonably be expected to be in the vicinity of the product during its reasonably expected use." Ind. Code §§ 34-6-2-29 ("Consumer") (emphasis added), 34-6-2-147 ("User").

Here, Johnson did not purchase the flavoring chemicals (ConAgra did), and there is no evidence that he "consume[d]" them. He, of course, was the injured party (not "any other person"). But is he properly characterized as an "individual who uses . . . the product," or as an injured "bystander?" I have purposely italicized those provisions in the above quotation to draw attention to the fact that those are the only categories that potentially cover Johnson. And if they do, his claim must be governed by the IPLA.

Johnson, a worker tasked with combining various inputs into slurry, was certainly an individual who "uses . . . the [flavoring chemicals]" allegedly supplied by Givaudan. Those chemicals, delivered to ConAgra in the final state intended for their use at the facility, were not going straight into bags of popcorn. As anyone in the trade (including Givaudan) would surely anticipate, the flavorings were inputs to a completely different product: buttery slurry. The fact that Givaudan's defective flavorings would eventually be incorporated indirectly into microwave popcorn sold to retail consumers does not change the fact that Givaudan manufactured and supplied the flavorings in their final state intended for use in commerce by ConAgra, as the direct purchaser, and "use[d]" by Johnson as a batch maker.

The "bystander" language also applies to Johnson's situation. The relevant question is whether it was reasonably foreseeable that he would be in the vicinity of the flavoring chemicals supplied by Givaudan to ConAgra during their "reasonably expected use." It seems pretty obvious that Givaudan, as a supplier of flavoring chemicals, could have reasonably foreseen that batch makers like Johnson would have been in the direct vicinity of the flavoring inputs in the course of producing batches of buttery slurry. And, indeed, according to his complaint, Johnson all but concedes the point. Here's what he tells me: "[I[n a manner reasonably foreseeable to all Defendants, in the course of his employment [Johnson] handled, mixed, blended, and/or incorporated into finished products toxic flavorings in a manner that created fumes and vapors, which he inhaled." [DE 34, ¶ 45.]

Case law also supports the view that Johnson is a "user or consumer" of the flavoring products at issue. It has long been clear that the statutory definition does not "include one who merely acquires and resells" a defective product. *Estate of Shebel v. Yaskawa Elec. Am., Inc.*, 713 N.E.2d 275, 278 (Ind. 1999) (citing *Thiele v. Faygo Beverage, Inc.*, 489 N.E.2d 562 (Ind. Ct. App. 1986)). At the same time, "us[ing] the [product] for its intended end use," including "the production" of new materials, can qualify an individual as a "'user' as this term is employed in the Act." *Id.* at 279. In *Shebel*, the decedent was hit in the chest by a piece of a computer-controlled lathe, which crashed as he was delivering a bill to the lathe operator. *Id.* at 277. The record reflected that the machine was "used" to "manufacture parts at trade shows," so the claims did not involve mere "possession of the lathe only for resale or for assembling its component parts," but rather a product "used . . . for its intended end use." *Id.* at 279.

*Butler v. City of Peru* and *Stegemoller v. AcandS, Inc.* are also instructive. In *Butler*, the Supreme Court of Indiana considered IPLA claims brought by a maintenance employee of a high school who was harmed while trying to fix a defective electrical outlet on the property. While the school was considered the "consuming entity" of the electricity, and there was no suggestion that the plaintiff was an end user or retail consumer of the electricity or the outlet through which it coursed, the plaintiff's injuries were nevertheless covered by the IPLA. 733 N.E.2d at 919. Similarly, in *Stegemoller*, the Court construed the IPLA to apply to a worker's spouse who contracted asbestos-related illness from fibers that her husband brought home from work on his clothing.

767 N.E.2d at 976. The Court rejected the argument that the spouse was not a "user or consumer" of the product as "too narrow a view" and inconsistent with the Act's purposes. *Id.*

It is true that another line of decisions suggests that Indiana law does not recognize a cause of action in product liability unless the product at issue was sold to end consumers. While Johnson has waived these arguments, they seem to provide some support for the conclusion that Johnson was not a "user or consumer" within the meaning of the Act. In *Thiele v. Faygo Beverage, Inc.*, the plaintiff suffered injuries while unloading bottles of soda pop due to a defect in the packaging. 489 N.E.2d at 585–86. The court held that the IPLA limits "users" or "consumers" to individuals who suffer foreseeable harms from a defective product "*at or after* the point of its retail sale or equivalent transaction with a member of the consuming public." *Id.* at 586. Because the plaintiff was a "'middle man' who [came] into contact with the product after it . . . entered the stream of commerce but before it reache[d] the ultimate consumer of the product," *see id.* at 574, 585, he suffered an injury prior to a "'sale' to a 'first consuming entity,'" and therefore he was not "entitled to the benefit of the strict liability theory of recovery stated" in the IPLA, *id.* at 588.

In *Vaughn v. Daniels Co. (W. Virginia)*, the Supreme Court of Indiana endorsed *Thiele*'s logic while clarifying when a product is in a "final state" sufficient to trigger IPLA liability. 841 N.E.2d 1133, 1142 (Ind. 2006). After suffering injuries on the job while installing a "heavy media coal sump" (part of a coal preparation plant), the plaintiff in

*Vaughn* asserted claims against his employer and the company with whom it had contracted to construct the coal preparation plant. *Id.* at 1136. Initially, the Court noted a "majority of other courts, including the Seventh Circuit applying Indiana law," had determined that "a products liability claim does not lie where the manufacturer has not completed its obligation to install or assemble the product but is available where the purchaser is required to install or assemble it." *Id.* at 1142 (citing *Lantis v. Astec Indus., Inc.*, 648 F.2d 1118, 1121–22 (7th Cir. 1981)). The Court also acknowledged the "Court of Appeals's view" in *Thiele*. *Id.* Applying *Thiele*'s verbiage, the Court held that the underlying contract to design, install, and construct a coal preparation plant—including the coal sump that the plaintiff was installing while he was injured—"was a transaction 'equivalent' to a 'retail sale' because it lodged the product with the buyer." *Id.* In making this determination, the Court clarified that "[a] PLA claim . . . requires that the product be in the *final state called for by the arrangement between the buyer and the seller*." *Id.* (emphasis added).

*Thiele* itself acknowledged that denying strict liability protection to employees of entities "in the distributive chain preceding the sale of a product to a 'first consuming entity'" stands in logical tension with the legislature's extension of such protection to bystanders. The court specifically noted that the rationale for extending the IPLA was "*equally applicable*" for both groups, suggesting that "a person in Robert Thiele's position . . . is as deserving of the protection of our Product Liability Act as *any bystander*." *Id.* at 588 (emphasis added). Notwithstanding this apparent logical

20

inconsistency, other courts have followed *Thiele*'s reasoning to conclude that claims should be excluded from the scope of the IPLA. *See, e.g., Davis v. Lippert Components Mfg., Inc.*, 95 N.E.3d 200 (Ind. Ct. App. 2018); *First Nat'l Bank of Danville v. Sys. Transp., Inc.*, 2005 WL 8178975, at *4 (N.D. Ill. May 17, 2005) (holding that family injured in car accident by allegedly defective construction lifts being transported on a trailer could not proceed under IPLA because the "[t]ransportation of the lifts is not a reasonable expected use to trigger bystander liability under the Act").

*Davis* arguably mirrors the claims at issue in this case. There, a "box installer" was injured in the course of installing a component to a towable travel trailer. 95 N.E.3d at 200–01. The Indiana Court of Appeals affirmed summary judgment on the plaintiff's product liability claims because he qualified neither as an "individual who uses or consumes the product," nor a "bystander." *Id.* at 202. The court reasoned that the product that harmed the plaintiff, a "Schwintek System In-Wall Slide Out" that his employer manufactured for incorporation into trailers and also sold direct-to-consumer, "was never intended or expected to 'reach the ultimate user or consumer in an unassembled or uninstalled form.'" *Id.* at 203 (quoting *Vaughn*, 841 N.E.2d at 1141). The production of towable trailers required assembly and installation of the system, after which the "trailer then needed to go through three more departments—trimming, final finish hangs, and a rain tunnel to check for leaks—before it was put in the yard and eventually sent to a dealer." *Id.* ("Davis's installation of the box and the Schwintek System was part of the assembly and manufacture of the trailer *before* being released

into the stream of commerce for public consumption."). The court noted that allowing the plaintiff to sue in strict liability would "controvert the exclusivity of the remedy" provided in the State's Workers Compensation System, and cause the statute of limitations for claims brought by the "ultimate purchasers of a trailer or recreational vehicle" to hinge on "the delivery date of a component part to a manufacturer, and not on the delivery date of the finished product to the consumer." *Id.* at 203–04.

While *Davis*, *Thiele*, and *Vaughn* bear some similarities to Johnson's situation, I am not persuaded that these authorities remove him from the ambit of the IPLA. The law on this point is not crystal clear, but requiring a retail sale of microwave popcorn to trip IPLA liability would border on the absurd. The flavoring chemicals at issue were allegedly manufactured and delivered to ConAgra in the form intended for their commercial use in the production process that Johnson was tasked with executing. The flavorings were in the "final state called for by the arrangement between the buyer and the seller" – here, ConAgra and its flavoring suppliers. *Vaughn*, 841 N.E.2d at 1142. They were signed, sealed, delivered following a "transaction 'equivalent' to a 'retail sale'" that "lodged the product with the buyer," namely ConAgra. *Id.* In this sense, Johnson's claims are distinguishable from the injuries allegedly caused by the trailer component in *Davis* and the coal sump in *Vaughn*, neither of which were in the final state called for by the arrangement between the buyer and the seller.

**IV.    The Applicability of the Asbestos Exception to the Case**

Finally, it's on to Plaintiffs' main argument for avoidance of the IPLA statute of

repose: that the Indiana Supreme Court has carved out a broad exception for products liability cases involving latent diseases from inherently dangerous products. In sum, they assert that the gravamen of their product liability claims is Mr. Johnson's protracted exposure to inherently dangerous chemicals. Therefore, they argue, a more relaxed rule should apply to determine the timeliness of the claims, based on when Mr. Johnson discovered his injuries.

This argument springs from a line of asbestos-related cases, in which Indiana courts have departed from the plain language of the IPLA statute of repose. I am not persuaded that Johnson's case falls into this limited, judicially-created exception for asbestos cases, for several reasons. The cited cases do not clearly cover Johnson's situation, the Indiana General Assembly specifically amended the IPLA statute of repose to exempt asbestos cases (as opposed to all products liability cases involving latent diseases from inherently dangerous products), and the record contains ample evidence that Johnson's injuries were apparent during his employment at ConAgra (in contrast to asbestos-related diseases, which lie dormant for decades). Therefore, I will apply the default statute of repose in the absence of controlling authority to the contrary.

Plaintiffs rely primarily on *Myers v. Crouse-Hinds Division of Cooper Industries, Inc.*, 53 N.E.3d 1160 (Ind. 2016), in which the Supreme Court of Indiana "restored as . . . controlling precedent" the Court's prior decision in *Covalt v. Carey Canada, Inc.*, 534 N.E.2d 382 (Ind. 1989). *See* 53 N.E.3d at 1167. In *Covalt*, the plaintiff alleged that his

exposure to raw asbestos, "an inherently dangerous foreign substance," caused him to develop a latent disease that he did not discover until more than ten years after his last exposure to the product. 543 N.E.2d at 384–85. Thus, the question presented was whether a plaintiff may bring suit "within two years after discovering a disease and its cause, notwithstanding that the discovery was made more than ten years after the last exposure to the product that caused the disease." *Id.* at 384.

Limiting the decision "to the precise factual pattern presented" — in other words, to asbestos cases — the Court held that "where the seeds of injury and latent disease are introduced into the body as a result of protracted exposure to a foreign substance, a plaintiff's cause of action cannot be barred by the ten year statute of repose, no matter when the plaintiff knew or should have discovered the resultant disease." *Id.* at 385, 387. The Court emphasized the "long latency period between exposure and manifestation in asbestos-related diseases," in concluding that the legislature did not intend to require a claimant in this situation to bring a product liability action within the ten-year limitations period. *Id.* at 386–87.

After *Covalt* was partially overruled, *see Allied Signal, Inc. v. Ott*, 785 N.E.2d 1068 (Ind. 2003),[1] the Supreme Court of Indiana revisited the decision in *Myers*. *See* 53 N.E.3d at 1162–63, 1168. The Court in *Myers* considered consolidated appeals from a group of

---

[1] While *Covalt* was pending, the state codified Ind. Code § 34-20-3-2, a statute that specifically applies to certain asbestos-related claims. The Court in *Allied Signal* determined that *Covalt* had been decided under an outdated statutory regime and the state's "adoption of Section 2" rendered *Covalt*'s analysis "obsolete." 785 N.E.2d at 1077. Although not germane to the facts of this case, the Court concluded that Section 2 applies only to asbestos claims against defendants who both mined and sold raw asbestos, leaving "those who sell asbestos-containing products within the ambit of Section 1." *Id.* at 1073.

plaintiffs alleging injuries from exposure to raw asbestos that did not manifest until the IPLA statute of repose had run. *Id.* at 1162–63. The plaintiffs presented evidence that "it takes about 20 years for a person to be ill enough to be diagnosed with an asbestos-related disease like asbestosis, and as many as 50 years after exposure for mesothelioma to be diagnosed." *Id.* at 1167–68. While the legal dispute in *Myers* centered on a constitutional challenge that is not directly relevant to this dispute, *see id.* at 1164, the decision is notable because the Court reinstated *Covalt*'s exception to the statute of repose in asbestos-related cases, *id.* at 1167 ("The relevant facts . . . as alleged by the plaintiffs, fall within our holding in *Covalt*."), 1168 ("[A]s we held in *Covalt* the Indiana Product Liability Act's statute of repose provision does not apply to bar these plaintiffs' claims for *asbestos injury and illness*." (emphasis added))*.* As in *Covalt*, the Court relied on the nuances of latent diseases caused by asbestos (namely, asbestosis and mesothelioma) to determine that the IPLA statute of repose did not apply to the plaintiffs' claims. *See id.* at 1166, 1168 (noting long latency period and no visible signs or symptoms of such diseases).

Plaintiffs assert that *Covalt* and *Myers* apply more broadly to all cases where a consumer is harmed by "protracted exposure to [any] foreign substance" — not just asbestos. [DE 179 at 4; DE 216 at 3–7.] And indeed, there is some dicta in the decisions suggesting that the Supreme Court intended to exempt from IPLA's scope *all* latent diseases caused by sustained exposure to inherently dangerous substances broadly, rather than only asbestos-related diseases. In that regard, Plaintiffs rely on an

unpublished federal district court decision entered last year. *In re Paraquat Products Liability Litigation*, 2022 WL 451898 (S.D. Ill. Feb. 14, 2022). [DE 179 at 4.] There, a putative class of Indiana residents claimed that they developed Parkinson's disease as a result of sustained exposure to paraquat (a toxic chemical widely used as a herbicide) that the defendants manufactured and distributed. 2022 WL 451898 at *1. In denying the defendants' motion to dismiss the claims on the pleadings, the court construed *Myers* to broadly exempt harms caused by protracted exposure to an inherently dangerous foreign substance, "*such as* asbestos," from the IPLA's statute of repose. *Id.* at *9 (emphasis added). Thus, the court ruled that the claims were "not barred by the statute of repose" because the plaintiffs had alleged that they were exposed to an "inherently dangerous foreign substance," which "caused their Parkinson's disease." *Id.* Importantly, and unlike in this case, the court specifically noted that the defendants had conceded that the "statute of repose has been construed by [Indiana] courts to exclude claims for disease." *Id.*

*In re Paraquat* is ultimately of limited value to Plaintiffs. Beside not having any precedential value, the decision includes no substantive analysis of the state law and relies in part on the defendants' concession that Indiana courts created a broad judicial exception to the IPLA statute of repose where a case involves "latent diseases" caused by substances like asbestos. *See* Reply, DE 812, *In re Paraquat*, 2022 WL 451898 (S.D. Ill. Jan. 11, 2022). Plaintiffs provide no state court authorities suggesting that the exception in *Myers* and *Covalt* extends so far, and further fail to grapple with the language in those

26

very decisions expressly cabining the holdings to long-term, difficult-to-discover diseases caused by asbestos exposure. The fact that other diseases may share some similarities with asbestosis and mesothelioma cannot overcome a dearth of authority carving those conditions out of the IPLA statute of repose.

What further seals the point is that the Indiana General Assembly responded to *Covalt* by amending the IPLA to specifically exempt claims based on personal injuries caused by exposure to asbestos. *See* Indiana Code § 34-20-3-2 (providing that claims for injury from asbestos exposure may be brought within two years of the plaintiff's discovery of asbestos-related injuries, notwithstanding default ten-year statute of repose). The amendment did not carve out any other conditions: "except for the cause of action expressly recognized in this section, this section does not otherwise modify the limitation of action or repose period contained in [Indiana Code 34-20-3-1]." Ind. Code § 34-20-3-2(f).

In *Myers*, the Supreme Court determined that this amendment, as construed by the state courts, "creat[ed] two disparately treated classifications," in violation of the Indiana Constitution. Because the non-severability clause in the amendment required the Court to "invalidate all of" the exemption, the Court "restored" *Covalt* as the "controlling precedent." 53 N.E.3d at 1166–67. Of course, *Myers* and *Covalt* dealt with asbestos injuries, and *Covalt* expressly limited its holding to "the precise factual pattern presented." 543 N.E.2d at 387. That the state legislature sought to specifically carve out

27

asbestos-related injuries buttresses my conclusion that the ten-year statute of repose applies *unless* a claim asserts injuries based on asbestos exposure.

The State of Indiana may conclude that a less punitive statute of repose is warranted where a plaintiff asserts long-term, latent injuries caused by exposure to inherently dangerous substances and codify a statutory exception to the IPLA statute of repose for such claims. But at this point neither its courts nor the General Assembly appear to have adopted any such rule. My job in this diversity case is to faithfully apply substantive state law applicable to Plaintiffs' tort claims, not to take the place of the General Assembly or Indiana's appellate courts. I therefore reject Plaintiffs' argument that *Covalt* and *Myers* establish an exception to the statute of repose in this case.

### V.   Johnson's Claims are Untimely Under Indiana Code § 34-11-2-4

Even if one were to conclude that the IPLA statute of repose does not apply to Mr. Johnson's claims, I'm not quite sure where that gets him; his claim would still run headlong into the otherwise applicable statute of limitations. *See* Ind. Code § 34-11-2-4 (applicable to personal injury negligence actions). In *Barnes v. A.H. Robins Co.*, 476 N.E.2d 84, 87 (Ind. 1985) the Indiana Supreme Court set out the applicable standard for analyzing the statute of limitations in a toxic tort case. It held that where "an injury to a plaintiff caused by a disease which may have been contracted as a result of protracted exposure to a foreign substance, . . . a discovery type rule should be applied, and the statute of limitations in such causes commences to run from the date the plaintiff knew or should have discovered that she suffered an injury or impingement, and that it was

caused by the product or act of another." *Id.* Accordingly, even if I were to adopt Johnson's view—that he avoids application of the IPLA statute of repose because his tort claims are based on "protracted exposure" to toxic chemicals—the result would be no different: the claims are untimely.

The limitations period started when Johnson knew or in the exercise of ordinary diligence should have known of his injuries, and therefore expired years prior to the filing of this action. *See id.* at 86; *Wehling v. Citizens Nat'l Bank*, 586 N.E.2d 840 (Ind. 1992); *accord Cooper Indus., LLC v. City of S. Bend*, 899 N.E.2d 1274, 1280 (Ind. 2009). The evidence is clear that many years prior to filing this lawsuit, Mr. Johnson was aware of and received extensive treatment for the same injuries for which he now seeks to recover. He claims that prolonged exposure to the toxic chemicals at issue in this case cause respiratory illnesses, including chronic cough, shortness of breath, and "other respiratory illness and disease," and that he "sustained injuries to his respiratory system and related illnesses and injuries" as a consequence of being exposed to Givaudan's flavorings. [DE 215 at 1.] The evidence before me shows "beyond reasonable dispute" that as early as 1998, he suffered from chronic respiratory illness consistent with these alleged injuries and consequently sought and obtained treatment from medical professionals. *See Rangel v. Schmidt*, 490 F. App'x 808, 810 (7th Cir. 2012) (affirming order granting summary judgment on plaintiff's negligence claims under Ind. Code § 34-11-2-4).

29

Certainly, a reasonable person in Johnson's position would have been aware of his alleged injuries no later than January 2009 – when surgical pathologists at the Mayo Clinic analyzed results of his lung biopsy and diagnosed him with "chronic bronchiolitis with bronchiectasis and mucostasis." [DE 211-1 at 41.] Indeed, in the course of discovery, Johnson identified this 2009 pathology report as a "diagnos[is]" of the exact variety of lung injury for which he seeks redress in this case. [DE 166; DE 166-1; DE 215 at 5.] When directly asked to identify any formal diagnoses of the type of respiratory disease he allegedly developed as a result of protracted exposure to Givaudan's toxic chemicals, Johnson conceded that he was put on notice of his respiratory injuries in 2009. That substantially reinforces my conclusion that there is no triable dispute that he knew of his injuries at least eleven years prior to the filing of his lawsuit. Thus, even if I were persuaded that his tort claims are not subject to the plain terms of the IPLA statute of repose, there is no material dispute that they are untimely under the applicable statute of limitations.

**ACCORDINGLY:**

Defendant Givaudan Flavors Corporation's Motion to Reinstate its Motion for Summary Judgment Based Upon the Statute of Repose [DE 248] is **GRANTED**. For the reasons explained in this opinion and order, Givaudan's motion for summary judgment [DE 169] is **GRANTED**. The Clerk is **DIRECTED** to enter judgment for Givaudan and administratively close this case.

**SO ORDERED.**

ENTERED: August 23, 2023.

 /s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT